## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **TOWN OF MADISONVILLE** | **CIVIL ACTION NO.:  18-7974** |
| **VERSUS** | |
| | **SECTION:** |
| **PURDUE PHARMA, L.P., PURDUE PHARMA, INC., THE PURDUE FREDERICK COMPANY, ALLERGAN USA, INC., ALLERGAN PLC, ENDO PHARMACEUTICALS, INC., ENDO HEALTH SOLUTIONS, INC., TEVA PHARMACEUTICAL INDUSTRIES, LTD., TEVA PHARMACEUTICALS USA, INC., CEPHALON, INC., JANSSEN PHARMACEUTICALS, INC., JOHNSON & JOHNSON, MALLINCKRODT PLC, MALLINCKRODT LLC, INSYS THERAPEUTICS, INC., McKESSON CORPORATION, CARDINAL HEALTH, INC., AND AMERISOURCEBERGEN DRUG CORPORATION** | **DISTRICT JUDGE** **MAGISTRATE JUDGE** |

## <u>COMPLAINT</u>

Plaintiff, The Town of Madisonville, ("Madisonville") a political subdivision of the State of Louisiana, through undersigned counsel, respectfully represents as follows:

### *INTRODUCTION*

1.

Opioid addiction is devastating our communities across the nation, and across the State of Louisiana.

2.

The highly addictive nature of opium, a naturally-occurring substance derived from the opium poppy, has been well documented for centuries.  These substances derived from opium

are classically referred to as opiates.  The risks associated with the use of opium/opiates led to control mechanisms being put into place on a world-wide scale since the early 1900s, seeking to prevent the non-medical use of opium.[1]

3.

Thereafter, pharmaceutical companies created opioids, which can be completely synthetic or semi-synthetic hybrids resulting from chemical modifications to natural opiates, that operate similarly to opiates by bonding to the same receptors in the brain.[2]

4.

The problem began, however, when pharmaceutical companies began selling opioids as fool's gold, claiming that a drug that works similarly to heroin was safe for widespread use at increasing dosages.

5.

Pharmaceutical companies deceived the public at large, in part, by heavy marketing of opioids to physicians, who were taught to believe that opioids are not addictive if prescribed for legitimate pain.  These companies claimed that the addiction rates were low when used for chronic pain, overstated the benefits of opioids while trivializing the addiction dangers of long-term use, sought to discredit non-opioid pain relievers, and pushed the concept of "pseudoaddiction" to explain and excuse drug-seeking behavior as an indicator that more opioids should be prescribed because the patient's pain was being under treated.[3]

---

[1] *See* Stedman's Medical Dictionary, 26th Edition (1995); https://www.pbs.org/wgbh/pages/frontline/shows/heroin/etc/history.html.
[2] https://www.cdc.gov/drugoverdose/opioids/terms.html.
[3] Art Van Zee, M.D., *The Promotion and Marketing of OxyContin:  Commercial Triumph, Public Health Tragedy*, 99(2) Am. J. Public Health, Feb. 2009, at 221-27, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2622774/; Marion S. Green and R. Andrew Chambers, *Pseudoaddiction:  Fact of Fiction? An Investigation of the Medical Literature*, 2(4) Curr. Addict Rep., 2015, at 310-17, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4628053/.

6.

Pharmaceutical companies were able to achieve their goal of increasing sales, in part, by filtering these messages through seemingly independent advocacy groups and "expert" physicians, both of whom provided expert opinions and "education" materials that favored and touted the use of opioids.  The false and deceptive messaging presented by these groups were provided, polished and approved by the undisclosed pharmaceutical companies that backed them.[4]

7.

Additionally, pharmaceutical companies, themselves and/or through third parties, deceptively and falsely cited scientific literature and studies for positions that were not, in fact, supported by said literature and studies to bolster their marketing and advertising campaigns and in efforts to offer false legitimacy to the claims they promoted.[5]

8.

The marketing and advertising by pharmaceutical companies has resulted in more opioids being sold, but not because of a change in the health of the population.  From 1999 to 2014, the prescriptions for opioids quadrupled without a corresponding increase in reports of pain by patients.[6]

---

[4]  Katie Mettler, *OxyContin:  How Misleading Marketing Got America Addicted*, The Washington Post, Feb. 21, 2018, https://www.washingtonpost.com/graphics/2018/national/amp-stories/oxycontin-how-misleading-marketing-got-america-addicted/?noredirect=on.
[5]  *Id.*
[6]  https://www.cdc.gov/drugoverdose/data/prescribing.html.

9.

From 2014-2016 in the State of Louisiana, there were on average 102.5 prescriptions for opioids per 100 residents.  In St. Tammany Parish, there were 109.3 prescriptions for opioids per 100 residents during the same timeframe.[7]

10.

These statistics lend support for the finding that most opioid addictions began with legitimately prescribed opioids.

11.

Even with slowly-declining prescription rates for opioids, the danger is far from over because a person addicted to prescribed opioids is forty (40) times more likely to be addicted to heroin, which is pharmacologically similar to prescription opioids.[8]  Prescription opioids are considered a gateway drug for heroin.  From 2010 to 2016, heroin-related overdose deaths have increased fivefold.[9]

12.

The drug distribution industry is supposed to serve as a check in the drug delivery system by securing and monitoring opioids at every step in the stream of commerce, protecting them from theft and misuse, and refusing to fulfill suspicious or unusual orders by downstream pharmacies, doctors, clinics or patients.  These distributors, named as defendants herein, woefully failed in this duty, instead consciously ignoring known or knowable problems and data in their supply chains.

---

[7] https://www.cdc.gov/drugoverdose/maps/rxrate-maps.html.
[8] https://www.cdc.gov/vitalsigns/heroin/index.html.
[9] https://www.cdc.gov/drugoverdose/opioids/heroin.html.

13.

These manufacturers and distributors intentionally and negligently created conditions in which vast amounts of opioids have flowed freely from drug manufacturers to innocent patients who become addicted, to opioid abusers, and even to illicit drug dealers – with distributors regularly fulfilling suspicious orders from pharmacies and clinics, who were economically incentivized to ignore "red flags" at the point of sale and before dispensing the pills.

14.

This conduct has allowed millions of opioid pills to be diverted from legitimate channels of distribution into the illicit black market in quantities that have fueled the opioid epidemic in the United States, the State of Louisiana and in Madisonville.  This is characterized as "opioid diversion."  The conduct of these manufacturers and distributors, who acted in contradiction to their legal and statutory duties, has created an environment in which opioid diversion is rampant. As a result, patients and unauthorized opioid users have ready access to illicit sources of diverted opioids.

15.

The pharmaceutical companies and their distributors share the responsibility for controlling the availability of prescription opioids.  Opioid "diversion" occurs whenever the supply chain of prescribing opioids is broken, and the drugs are transferred from a legitimate channel of distribution or use, to an illegitimate channel of distribution or use.  Diversion can occur at any point in the opioid supply chain, including at the pharmacy level when prescriptions are filled for any reason other than a legitimate medical purpose.

16.

This shared responsibility stems from various obligations these entities take on in order to have the right to manufacture, sell and distribute these drugs that have been categorized by the

5

U.S. Drug Enforcement Administration as being "dangerous" and having a "high potential for abuse, with use potentially leading to severe psychological or physical dependence."[10]

17.

Pharmaceutical companies and distributors have duties under federal and state laws to investigate and prevent diversion, and to monitor, report and prevent suspicious orders of these drugs.  Further, the information regarding the volume, frequency and pattern of opioid orders placed and filled is and has been in the possession of both the pharmaceutical companies and their distributors.  Despite this information, these entities have allowed diversion through suspicious orders in the form of orders deviating from the normal patterns of prior orders, unusual frequency of and duration of orders, and large orders that do not correspond with the size of the community served.

18.

Pharmaceutical companies and distributors have both failed in meeting the duties imposed on them, leading to the flood of opioids into communities, such as Madisonville, and causing this epidemic that is facing our nation.

19.

The problems caused by the opioid epidemic affect our communities from adults down to newborns.  Adults are addicted to or abusing opioids, children are eating opioids that they mistake for candy, and the use of opioids by pregnant women leads to addicted newborns.  There are increasing rates of babies being born with neonatal abstinence syndrome (i.e., opioid withdrawal).[11]

---

[10] *See* https://www.dea.gov/drug-scheduling (defining Schedule II drugs, which includes opioids).
[11] https://www.drugabuse.gov/related-topics/trends-statistics/infographics/dramatic-increases-in-maternal-opioid-use-neonatal-abstinence-syndrome.

20.

The high rate of prescriptions and significant effect on communities has translated into efforts to combat this rising tide by getting people off of opioids.  From 2013 to 2015, there were 6,252 opioid-related substance abuse treatment admissions in Louisiana.[12]

21.

The costs related to the opioid crisis are steep.  The Louisiana Commission on Preventing Opioid Abuse has estimated that opioid abuse costs Louisiana $296 million a year in health care expenditures alone.[13]

22.

The costs associated with the affect this epidemic is having and will have on Plaintiff, The Town of Madisonville, from the time, resources, training, and taxes it will take to combat the ills that have been born from this epidemic, is the purpose of this action.  The financial burden should fall to those who caused this epidemic, the entities made Defendants herein.

### DEFENDANTS

23.

Made Defendants herein are:

A.  Purdue Pharma, L.P. – a foreign limited partnership organized and existing under the laws of the State of Delaware, with its principal place of business/headquarters located in the State of Connecticut, which engages in business in the State of Louisiana, but has not designated and does not maintain a registered agent within

---

[12] Louisiana Department of Health, *Opioid Abuse, Prevention, Treatment and Policy, Quick Facts* (January 2017), available at http://ldh.la.gov/assets/opioid/OpioidAbsePrvntn_2017.pdf.
[13] Louisiana Commission on Preventing Opioid Abuse, *supra* note 44, at 17, citing Matrix Global Advisors, LLC (2014) Health Care Costs from Opioid Abuse: A State by State Analysis.

the state.  Purdue Pharma, L.P. manufactures, sells and distributes opioids such as OxyContin and MS Contin;

B. Purdue Pharma, Inc. – a foreign corporation organized and existing under the laws of the State of New York, with its principal place of business/headquarters located in the State of Connecticut, which engages in business in the State of Louisiana, but has not designated and does not maintain a registered agent within the state. Purdue Pharma, Inc. manufactures, sells and distributes opioids such as OxyContin and MS Contin;

C. The Purdue Frederick Company – a foreign corporation organized and existing under the laws of the State of Delaware, with its principal place of business/headquarters located in the State of Connecticut, which engages in business in the State of Louisiana, but has not designated and does not maintain a registered agent within the state.  Purdue Frederick manufactures, sells and distributes opioids such as OxyContin and MS Contin;

D. Allergan USA, Inc. – a foreign corporation organized and existing under the laws of the State of Delaware, with its principal place of business/headquarters in the State of New Jersey, which is authorized to and doing business in the State of Louisiana.  Allergan manufactures, sells and distributes opioids such as Kadian and Norco;

E. Allergan, PLC - a foreign public limited company incorporated in Ireland with its principal place of business in Dublin, Ireland, which engages in business in the State of Louisiana, but has not designated and does not maintain a registered agent within the state.  Allergan manufactures, sells and distributes opioids such as Kadian and Norco;

8

F.   Endo Pharmaceuticals, Inc. – a foreign corporation organized and existing under the laws of the State of Delaware, with its principal place of business/headquarters in the State of Pennsylvania, which engages in business in the State of Louisiana, but has not designated and does not maintain a registered agent within the state. Endo manufactures, sells and distributes opioids such as Percocet, Opana and Opana ER;

G.   Endo Health Solutions, Inc. - a foreign corporation organized and existing under the laws of the State of Delaware, with its principal place of business/headquarters in the State of Pennsylvania, which engages in business in the State of Louisiana, but has not designated and does not maintain a registered agent within the state. Endo manufactures, sells and distributes opioids such as Percocet, Opana, and Opana ER;

H.   Teva Pharmaceuticals USA, Inc. - a foreign corporation organized and existing under the laws of the State of Delaware, with its principal place of business/headquarters in the State of Pennsylvania, which engages in business in the State of Louisiana, but has not designated and does not maintain a registered agent within the state.  Teva manufactures, sells and distributes opioids such as Actiq and Fentora;

I.   Teva Pharmaceutical Industries, LTD. – a foreign corporation organized and existing under the laws of the country of Israel, with its principal place of business in Israel, which engages in business in the State of Louisiana, but has not designated and does not maintain a registered agent within the state.  Teva manufactures, sells and distributes opioids such as Actiq and Fentora;

J.  Cephalon, Inc. – a foreign corporation organized and existing under the laws of the State of Delaware, with its principal place of business/headquarters in the State of Pennsylvania, which engages in business in the State of Louisiana, but has not designated and does not maintain a registered agent within the state.  Cephalon, a wholly-owned subsidiary of Teva, manufactures, sells and distributes opioids such as Actiq and Fentora;

K.  Janssen Pharmaceuticals, Inc. - a foreign corporation organized and existing under the laws of the State of Pennsylvania, with its principal place of business/headquarters in the State of New Jersey, which engages in business in the State of Louisiana, but has not designated and does not maintain a registered agent within the state.  Janssen manufactures, sells and distributes opioids such as Duragesic and Sublimaze;

L.  Johnson & Johnson – a foreign corporation organized and existing under the laws of the State of New Jersey, with its principal place of business/headquarters in the State of New Jersey, which engages in business in the State of Louisiana, but has not designated and does not maintain a registered agent within the state.  Johnson & Johnson, the parent company of Janssen, manufactures, sells and distributes opioids such as Duragesic and Sublimaze;

M.  Mallinckrodt, PLC – a foreign public limited company organized and existing under the laws of the country of England, with its U.S. headquarters in the State of Missouri, which engages in business in the State of Louisiana, but has not designated and does not maintain a registered agent within the state.  Mallinckrodt manufactures, sells and distributes opioids such as generic oxycodone;

N.  Mallinckrodt, LLC - a foreign limited liability company organized and existing

under the laws of the State of Delaware, with its principal place of business in the State of Missouri, which engages in business in the State of Louisiana, but has not designated and does not maintain a registered agent within the state.  Mallinckrodt manufactures, sells and distributes opioids such as generic oxycodone;

O. Insys Therapeutics, Inc. - a foreign corporation organized and existing under the laws of the State of Delaware, with its principal place of business in the State of Arizona, which engages in business in the State of Louisiana, but has not designated and does not maintain a registered agent within the state.  Insys manufactures, sells and distributes opioids such as Subsys;

P. McKesson Corporation - a foreign corporation organized and existing under the laws of the State of Delaware, with its principal place of business in the State of California, which is authorized to and engages in business in the State of Louisiana.  McKesson operates as a licensed distributor of prescription drugs, including opioids, for providers and retailers in the State of Louisiana, including in Madisonville;

Q. Cardinal Health, Inc. – is a foreign corporation with its principal place of business in the State of Ohio.  Cardinal operates as a licensed distributor of prescription drugs, including opioids, for providers and retailers in the State of Louisiana, including in Madisonville; and

R. AmerisourceBergen Drug Corporation - a foreign corporation organized and existing under the laws of the State of Delaware, with its principal place of business in the State of Pennsylvania, which is authorized to and engages in business in the State of Louisiana.  AmerisourceBergen operates as a licensed distributor of prescription drugs, including opioids, for providers and retailers in

the State of Louisiana, including in Madisonville.

At times, these Defendants will be referred to herein as the "Pharmaceutical Defendants," referring to Defendants A-O, and "Distributor Defendants," referring to Defendants P-R.

### *JURISDICTION*

24.

Jurisdiction of this matter is conferred by 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and there is complete diversity of citizenship among the parties; venue of this action is pursuant to 28 U.S.C. § 1391 (b) and (c).

25.

Defendants are subject to personal jurisdiction in this Court pursuant to the long-arm statute for the State of Louisiana and the Constitution of the United States.  Upon information and belief, Defendants, through the sale, marketing and/or distribution of their pharmaceutical products, have substantial contacts with the State of Louisiana, and have transacted substantial business in the State of Louisiana.  Defendants' conduct has caused actual injury to Madisonville, which injury occurred in the State of Louisiana.  Upon information and belief, Defendants have purposefully directed their activities and consummated numerous transactions in the State of Louisiana and/or performed acts by which they have each purposefully availed themselves of the privilege of conducting activities in the State of Louisiana, thereby invoking the benefits and protections of the law of the State of Louisiana.

### *STATUTES OF LIMITATIONS ARE TOLLED AND DEFENDANTS ARE ESTOPPED FROM ASSERTING STATUTES OF LIMITATIONS AS DEFENSES*

26.

Madisonville contends that it continues to suffer harm from the unlawful actions by Defendants.

27.

The continued tortious and unlawful conduct by Defendants causes a repeated or continuous injury.  The damages have not occurred all at once, but have continued to occur and have increased as time progresses.  The tort is not completed nor have all the damages been incurred until the wrongdoing ceases.  The wrongdoing and unlawful activity by Defendants has not ceased.  The public nuisance remains unabated, and the conduct causing the damages remains unabated.

28.

Defendants are equitably estopped from relying upon statutes of limitations defenses because they undertook active efforts to deceive Madisonville and/or doctors and patients in its community and to purposefully conceal their unlawful conduct and fraudulently assure the public, including the State, Madisonville, and its community, that they were undertaking efforts to comply with their obligations under the state and federal controlled substances laws, all with the goal of protecting and to continue generating profits.  Defendants affirmatively assured the public, including the State, Madisonville, and its community, that they were working to curb the opioid epidemic.

29.

Defendants distorted the meaning or import of studies they cited and offered them as evidence for propositions the studies did not support.  Defendants invented "pseudoaddiction" and promoted it to an unsuspecting medical community.  Defendants provided the medical community with false and misleading information about ineffectual strategies to avoid or control opioid addiction.  Defendants recommended to the medical community that dosages be increased, without disclosing the risks.  Defendants spent millions of dollars over a period of

years on a misinformation campaign aimed at highlighting opioids' alleged benefits, disguising the risks, and promoting sales.  The medical community, consumers, the State, and Madisonville were duped by Defendants' campaign to misrepresent and conceal the truth about the opioid drugs that they were aggressively pushing in the State and in Madisonville.

30.

Defendants intended that their actions and omissions would be relied upon, including by Madisonville and its community, who did not know, and did not have the means to know, the truth due to Defendants' actions and omissions.

31.

Madisonville and its community reasonably relied on Defendants' affirmative statements regarding their purported compliance with their obligations under the law.

32.

Madisonville's claims are further subject to equitable tolling, stemming from Defendants knowingly and fraudulently concealing the facts alleged herein.  As alleged herein, Defendants knew of the wrongful acts set forth herein, and had material information pertinent to their discovery, and concealed said facts and information from Madisonville.  Madisonville did not know, or could not have known through the exercise of reasonable diligence, of its cause of action, as a result of Defendants' conduct.

33.

Under the Louisiana doctrine of *contra non valentem agere nulla currit praescriptio,* the prescriptive period, i.e. the statute of limitations, does not run on any causes of action asserted herein because Defendants have concealed information and misled Madisonville.  Defendants are estopped from asserting any statute of limitations or prescriptive period as a defense because

14

they intentionally concealed facts and engaged in fraudulent practices that prevented Madisonville from discovering their wrongful conduct.

34.

The purposes of the statutes of limitations period and prescriptive periods, if any, are satisfied because Defendants cannot claim prejudice due to a late filing where Madisonville filed suit promptly upon discovering the facts essential to its claims, described herein, which Defendants knowingly concealed.

35.

In light of their statements to the media, in legal filings, and in settlements, it is clear that Defendants had actual or constructive knowledge that their conduct was deceptive, in that they consciously concealed the schemes set forth herein.

36.

Defendants continually and secretly engaged in their scheme to avoid compliance with their legal obligations.  Only Defendants and their agents knew or could have known about Defendants' unlawful actions because Defendants made deliberate efforts to conceal their conduct.  As a result of the above, Madisonville was unable to obtain vital information bearing on its claims.

37.

The allegations set forth in this Complaint establish the liability of the Defendants unto Madisonville under numerous causes of action set forth hereinafter.  To the extent that any causes of action may be deemed to be inconsistent with any other causes of action, they shall be deemed to be pled in the alternative.

### COUNT NO. I:  VIOLATION OF LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW

38.

Madisonville incorporates by reference all other paragraphs of this Complaint as if fully set forth here, and further alleges as follows.

39.

The Louisiana Unfair Trade Practices and Consumer Protection Law, La. R.S. §§ 51:1401, *et seq*., declares any unfair or deceptive acts or practices in the conduct of any trade or commerce to be unlawful.

40.

"Trade" or "commerce" is defined as "the advertising, offering for sale, sale, or distribution of any services and any property . . . or thing of value wherever situated, and includes any trade or commerce directly or indirectly affecting the people of the state."  La. R.S. § 51:1402 (10).

41.

In violation of Louisiana law, Pharmaceutical Defendants used false, misleading and deceptive acts and practices to promote their opioids through sophisticated and targeted marketing schemes aimed at consumers and health care providers.

42.

In their advertising and marketing, Pharmaceutical Defendants claimed that the formulation of their opioids mitigated the potential for addiction; going so far as to market to doctors and patients that the risk of addiction was less than one percent (1%).[14]

---

[14] Art Van Zee, M.D., *The Promotion and Marketing of OxyContin:  Commercial Triumph, Public Health Tragedy*, 99(2) Am. J. Public Health, Feb. 2009, at 221-27, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2622774/.

43.

Pharmaceutical Defendants routinely overstated the safety of opioids by overestimating the effectiveness of opioids for the treatment of chronic, non-cancer pain while underestimating the risks.[15]

44.

Pharmaceutical Defendants conducted an aggressive and incentive-laden marketing strategy to physicians.  Defendants promoted the idea of a "pain crisis" that opioids could be used to resolve, and used "educational" videos and programs as marketing tools to shift opinions on opioids.  Physicians were taught that they need not worry about the addictive potential of opioids if a patient was truly in pain.  Opioid addiction was marketed as an overblown roadblock to compassionate pain care.  All of this "educational" information was provided to convince doctors that opioids were, in fact, under prescribed.[16]

45.

Pharmaceutical Defendants further marketed opioids by promoting the idea that what was traditionally thought to be addictive, drug-seeking behavior (i.e., requesting medication prior to scheduled dosing, requesting specific opioids, and engaging in pain behaviors in an effort to elicit drug delivery) is not an indicator of opioid addiction but "pseudoaddiction," which results from ineffective, under-treatment of the patient's pain.  Resolution of this "pseudoaddiction" is resolved by adjusting dosage, increasing opioid potency and decreasing dosing intervals.[17]

---

[15]  *Id.*

[16]  *Id.*

[17]  Marion S. Green and R. Andrew Chambers, *Pseudoaddiction:  Fact of Fiction? An Investigation of the Medical Literature*, 2(4) Curr. Addict Rep., 2015, at 310-17, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4628053/.

46.

In promoting and advertising their various opioids, Defendants materially misrepresented crucial information about these drugs.  Such acts violating Louisiana law included, but are not limited to, the following:

A.   Misrepresenting or failing to adequately disclose the risk of addiction of opioids;

B.   Misrepresenting the potential for abuse of opioids;

C.   Misrepresenting the abuse-deterrent formulation properties of opioids;

D.   Misrepresenting the therapeutic benefits of opioids;

E.   Misrepresenting or failing to adequately disclose the material risks of opioids;

F.   Making false and unsubstantiated representations about the concept of "pseudoaddiction";

G.   Misrepresenting the signs of addiction to opioids;

H.   Misrepresenting the ease of preventing addiction in patients taking opioids; and

I.   Misrepresenting the safety of treating patients with opioids.

47.

Distributor Defendants also committed numerous and repeated unfair and deceptive acts or practices in the conduct of commerce.

48.

As set forth herein, Distributor Defendants failed to report and/or prevent the diversion of highly addictive prescription drugs to illegal sources.

49.

Distributor Defendants' marketing, sales and/or distribution practices led to them violating their non-delegable duties to guard against and prevent diversion of prescription opioids, and caused the opioid epidemic facing this Nation, State and Madisonville.

50.

Distributor Defendants' deceptive trade practices, violating Louisiana law, include, but are not limited to, the following:

    A.  Failing to monitor suspicious orders of prescription opioids;

    B.  Failing to detect suspicious orders of prescription opioids;

    C.  Failing to investigate suspicious orders of prescription opioids;

    D.  Filling and/or failing to refuse fulfillment of suspicious orders of prescription opioids;

    E.  Failing to report suspicious orders of prescription opioids; and

    F.  Falsely misrepresenting to the public that they were complying with their legal obligations.

51.

As a result of Defendants' conduct, Madisonville was damaged and seeks recovery, including, but limited to, treble damages that are allowable under the statute.  *See* La. R.S. § 51:1409 (A).

## COUNT NO. II:  PUBLIC NUISANCE

52.

Madisonville incorporates by reference all other paragraphs of this Complaint as if fully set forth here, and further alleges as follows.

53.

The opioid epidemic in the State, including in Madisonville, remains an immediate hazard to public health and safety.

19

54.

The opioid epidemic in Madisonville is a continuous public nuisance and remains
unabated.

55.

Louisiana has found that a prohibited activity under its public nuisance statutes can
include the illegal manufacture, sale or distribution of, or possession with intent to manufacture,
sell, or distribute, a controlled dangerous substance, which include opiates.  La. R.S. §§
13:4711(4)(b); La. R.S. § 40:961 (26), (27).  Madisonville has the right and the power to
suppress nuisances.  *See City of Shreveport v. Leiderkrantz Soc.*, 130 La. 802, 806, 58 So. 578,
579 (1912); *Board of Aldermen of Opelousas v. Norman*, 51 La. Ann. 736, 738-39, 26 So.
401,402 (1899); *see also* La. R.S. § 13:4712 (governing authority of city-parish has authority to
seek an injunction or order of abatement).

56.

Each Defendant is liable for public nuisance because its conduct at issue has caused an
unreasonable and substantial interference with a right common to the general public, which is the
proximate cause of, and/or substantial factor leading to, Madisonville's injury.  *See* Restatement
Second, Torts § 821B.

57.

By causing dangerously addictive drugs to flood the community, and to be diverted for
illicit purposes, in contravention of federal and state law, each Defendant has injuriously affected
rights common to the general public, specifically including the rights of the people of
Madisonville to public health, public safety, public peace, public comfort, and public
convenience, and to be free from conduct that creates a disturbance and reasonable apprehension

of danger to person and property.  The public nuisance by Defendants' actions has caused

substantial annoyance, inconvenience and injury to the public.

58.

By selling and/or distributing dangerously addictive opioid drugs diverted from a

legitimate medical, scientific, or industrial purpose, Defendants have committed a course of

conduct that detrimentally affects the safety, health, and morals of the people of Madisonville.

59.

Madisonville alleges that Defendants' wrongful and illegal actions have created a public

nuisance.  Each Defendant is liable for public nuisance because its conduct at issue has caused an

unreasonable interference with a right common to the general public.

60.

Defendants have intentionally and/or unlawfully created a nuisance.

61.

Defendants' conduct in illegally distributing and selling prescription opioids, or causing

such opioids to be distributed and sold, where Defendants knew, or reasonably should have

known, such opioids would be diverted and possessed and/or used illegally in Madisonville is of

a continuing nature.

62.

Defendants' actions have been of a continuing nature and have produced a significant

effect upon the public's rights, including the public's right to health and safety.

63.

A violation of any rule or law controlling the distribution of a drug of abuse in

Madisonville and the State is a public nuisance.

64.

Because of the continued use and addiction caused by these illegally distributed opioids, the public will continue to fear for its health, safety and welfare, and will be subjected to conduct that creates a disturbance and reasonable apprehension of danger to person and property.

65.

Defendants know, or reasonably should know, that their conduct will have an ongoing detrimental effect and constitutes an unreasonable invasion upon the public health, safety and welfare, and the public's ability to be free from disturbance and reasonable apprehension of danger to person and property.

66.

Defendants are (or should be) aware, of the unreasonable interference that their conduct has caused in Madisonville.  Defendants are in the business of manufacturing, marketing, selling, and/or distributing prescription drugs, including opioids, which are specifically known to Defendants to be dangerous under federal and state law.  *See, e.g.*, 21 U.S.C. § 812 (b)(2).

67.

Defendants' conduct in marketing, distributing, and selling prescription opioids which they know, or reasonably should know, will likely be diverted for non-legitimate, non-medical use, creates a strong likelihood, and is or should be reasonably foreseeable, that these illegal distributions of opioids will cause death and injuries to residents in Madisonville, and otherwise significantly and unreasonably interfere with public health, safety and welfare, and with the public's right to be free from disturbance and reasonable apprehension of danger to person and property.

68.

Defendants' conduct, which has led to the vast increase in the availability of opioids, makes it easier for persons to divert prescription opioids, constituting a dangerous threat to the public.

69.

The presence of diverted prescription opioids in Madisonville, and the consequence of prescription opioids having been diverted in Madisonville, proximately results in and/or substantially contributes to the creation of significant costs to it in order to enforce the law, equip its police force and treat the victims of opioid abuse and addiction.

70.

Stemming the flow of illegally distributed prescription opioids, and abating the nuisance caused by the illegal flow of opioids, will help to alleviate this problem, save lives, prevent injuries and make Madisonville a safer place to live.

71.

Defendants' conduct is a direct and proximate cause of and/or a substantial contributing factor to opioid addiction and abuse in Madisonville, costs borne by it, and a significant and unreasonable interference with public health, safety and welfare, and with the public's right to be free from disturbance and reasonable apprehension of danger to person and property.

72.

Defendants' conduct constitutes a public nuisance and, if unabated, will continue to threaten the health, safety and welfare of the residents of Madisonville, creating an atmosphere of fear and addiction that tears at the residents' sense of well-being and security. Madisonville has a clearly ascertainable right to abate conduct that perpetuates this nuisance.

73.

The damages available to Madisonville include, *inter alia*, recoupment of governmental costs flowing from an ongoing and persistent public nuisance which the government seeks to abate. Defendants' conduct is ongoing and persistent, and Madisonville seeks all damages flowing from Defendants' conduct. Madisonville further seeks to abate the nuisance and harm created by Defendants' conduct.

## COUNT NO. III:  FRAUD

74.

Madisonville incorporates by reference all other paragraphs of this Complaint as if fully set forth here, and further alleges as follows.

75.

While promoting and advertising their opioids, Defendants made numerous, material misrepresentations of fact and omitted and/or concealed information, including that the formulas for its opioids mitigated addiction, that the risk of addiction was less than one percent (1%), and making false statements related to compliance with state and federal laws related to their duties to prevent diversion and duties to monitor, report and prevent suspicious orders.

76.

Scientific studies have shown that these representations are in fact false. There is no evidence supporting that the formulation of opioids has led to the deterrence of their abuse, and the incidents of addiction from prescribed opioids has been shown to range to as high as fifty percent (50%) with long-term opioid treatment for patients with chronic non-cancer related pain, depending on the criteria and subpopulation used as part of the study.[18]

---

[18]  Marion S. Green and R. Andrew Chambers, *Pseudoaddiction:  Fact of Fiction? An Investigation of the Medical Literature*, 2(4) Curr. Addict Rep., 2015, at 310-17, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4628053/.

77.

These statements were made to the public at large and physicians as part of Defendants' aggressive marketing of opioids to materially change the perception attached to these highly-addictive, opium related substances, which history has shown be linked to a high risk of abuse and addiction.

78.

Defendants knew that their representations were false or had no credible evidence to support their representations, which they made in order to increase the sales of their various opioids.

79.

The public at large and physicians to whom these representations were made did not know that said representations were false, and reasonably relied on the truth of Defendants representations in prescribing and taking their opioids, considering the numerous federal, state and local laws that govern the pharmaceutical industry and prohibit false and misleading advertising and marketing.

80.

As a result of Defendants fraudulent misrepresentations, omissions and/or concealment of facts, Madisonville has incurred harm, suffered damages and seeks recovery.

### COUNT IV:  NEGLIGENCE AND NEGLIGENT MISREPRESENTATION

81.

Madisonville incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges as follows.

82.

Madisonville seeks recovery of economic damages which were the foreseeable result of Defendants' intentional and/or unlawful actions and omissions.

83.

Defendants violated Louisiana Civil Code articles 2315 and 2316 by their negligence and negligent misrepresentations.

84.

Article 2315 of the Louisiana Civil Code provides that "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."

85.

Article 2316 the Louisiana Civil Code provides that "Every person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill."

86.

Each Defendant had an obligation to exercise reasonable care and/or due care in marketing, selling, and/or distributing highly dangerous opioid drugs within the State of Louisiana and Madisonville.

87.

Each Defendant owed a duty to Madisonville and its community because the injury was foreseeable, and in fact foreseen, by Defendants.

88.

Reasonably prudent manufacturers and/or distributors of prescription opioids would have anticipated that the scourge of opioid addiction would wreak havoc on communities, and the

significant costs which would be imposed upon the governmental entities associated with those communities, such as Madisonville.

89.

The escalating amounts of addictive drugs flowing through Defendants' businesses, and the sheer volume of these prescription opioids, further alerted Defendants that addiction was fueling increased consumption and that legitimate medical purposes were not being served.

90.

Defendants' breaches were intentional and/or unlawful, and their conduct was willful, wanton, malicious, reckless, oppressive, and/or fraudulent.

91.

The causal connection between Defendants' breaches of their duties and misrepresentations and the ensuing harm was entirely foreseeable.

92.

Defendants' breaches of their duties and misrepresentations were the cause-in-fact of Madisonville's injuries.

93.

The risk of harm to Madisonville and the harm caused were within the scope of protection afforded by Defendants' duty to exercise due and reasonable care in marketing, selling, and/or distributing highly dangerous opioid drugs in the State and Madisonville. Defendants' substandard conduct was a legal cause of Madisonville's injuries.

94.

As described in this Complaint in allegations expressly incorporated herein, Defendants' breaches of duty and misrepresentations caused, bears a causal connection with, and/or proximately resulted in the damages sought herein.

95.

Defendants' unlawful and/or intentional actions as described herein create a rebuttable presumption of negligence and negligent misrepresentation under State law.

96.

As a result of Defendants' conduct, Madisonville suffered damages and seeks recovery.

### COUNT NO. V:  FALSE ADVERTISING

97.

Madisonville incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges as follows.

98.

Louisiana Revised Statute § 40:625 (A) provides that "an advertisement of a . . . drug . . . is false if it is false or misleading in any particular . . . Any representation concerning any effect of a drug or device is false . . . if it is not supported by demonstrable scientific facts or substantial and reliable medical or scientific opinion."

99.

"Advertisement" includes all representations of fact or opinion disseminated to the public in any manner or by any means other than by the labeling.  La. R.S. § 40:602 (1).

100.

Defendants violated Louisiana Revised Statute § 40:625 as they engaged in false advertising in the conduct of a business, trade or commerce in this State.

101.

As set forth herein, Defendants violated Louisiana Revised Statute § 40:625 by making and disseminating untrue, false and misleading advertisements to consumers in this State and in Madisonville, promoting the sale and use of opioids to treat chronic pain, and by causing untrue,

false, and misleading advertisements about opioids to be made or disseminated to Louisiana

consumers in order to promote the sale and use of opioids to treat chronic pain. These untrue,

false, and misleading statements in advertisements and other patient brochures included, but

were not limited to:

     A.   Misrepresenting the truth about how opioids lead to addiction;

     B.   Misrepresenting that opioids improve function;

     C.   Misrepresenting that addiction risk can be managed;

     D.   Misleading patients through the use of terms like "pseudoaddiction";

     E.   Falsely claiming that withdrawal is simply managed;

     F.   Misrepresenting that increased doses pose no significant additional risks; and

     G.   Falsely omitting or minimizing the adverse effects of opioids and overstating the

        risks of alternative forms of pain treatment.

102.

At all times relevant to this Complaint, Defendants, directly, and through third parties,

and by aiding and abetting third parties, also violated Louisiana Revised Statute § 40:625

through misleading advertisements in various marketing channels, including but not limited to:

advertisements, brochures, and other patient education materials that omitted or concealed

material facts to promote the sale and use of opioids to treat chronic pain.  Defendants repeatedly

failed to disclose or minimized material facts about the risks of opioids, including the risk of

addiction, and their risks compared to alternative treatments.  Such material omissions were

deceptive and misleading in their own right, and further rendered even otherwise truthful

statements about opioids untrue, false, and misleading, creating a misleading impression of the

risks, benefits, and superiority of opioids for treatment of chronic pain.

103.

Defendants knew at the time of making or disseminating these misstatements and material omissions, or causing these misstatements and material omissions statements to be made or disseminated, that they were untrue, false, or misleading and therefore likely to deceive the public.  In addition, Defendants knew or should have known that their marketing and promotional efforts created an untrue, false, and misleading impression of the risks, benefits, and superiority of opioids.

104.

In sum, Defendants:  (a) directly engaged in untrue, false, and misleading advertising; (b) disseminated the untrue, false, and misleading advertisements through third parties; and (c) aided and abetted the untrue, false, and misleading advertising by third parties.

105.

All of this conduct, separately and collectively, was intended to deceive Louisiana consumers and the political subdivisions of the State, including Madisonville, who bore increased costs associated with foreseeable criminal activity arising from the rise in addiction that was a direct consequence of Defendants' promotion of misleading advertisements about opioid risks and benefits.

106.

As a result of Defendants' false advertising, Madisonville has incurred damages and seeks recovery.

### COUNT NO. VI:  MISBRANDING DRUGS

107.

Madisonville incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges as follows.

108.

Louisiana Revised Statute § 40:617 (A)(2) provides that a drug is considered misbranded if it "is dangerous to health under the conditions of use prescribed in the labeling or advertising thereof .... "

109.

Additionally, in Louisiana, a manufacturer illegally "misbrands" a drug if the drug's labeling is false or misleading.  La. R.S. § 40:617 (A).

110.

"Labeling" includes all labels and other written, printed, and graphic matter, in any form whatsoever, accompanying any drug.  La. R.S. § 40:602.

111.

Any representation concerning any effect of a drug is considered false if the representation is not supported by demonstrable scientific facts, or substantial and reliable medical or scientific opinion.  La. R.S. § 40:617.

112.

Defendants violated Louisiana Revised Statute § 40:617 by misbranding drugs in the conduct of a business, trade or commerce in this State.

113.

By falsely promoting the message, *inter alia,* that opioids were unlikely to lead to addiction; that the rare incidence of addiction could be easily managed; that opioids were appropriate and first-line treatment for chronic pain; that withdrawal is easily managed; that increased doses of opioids posed no additional risks; and by falsely omitting or minimizing the adverse effects of opioids, Defendants promoted a product that was dangerous to health under

the conditions and use prescribed in their advertisements and marketing and therefore misbranded.

114.

Defendants also violated Louisiana Revised Statute § 40:617 by promoting products through advertising and marketing claims that were not supported by demonstrable scientific facts or substantial and reliable medical or scientific opinion, thereby rendered their drugs misbranded.

115.

By reason of the foregoing, Madisonville was injured and continues to be injured in that Defendants offered drugs dangerous to health under the use prescribed in their labeling and in that Defendants' labeling contained representations that were not supported by demonstrable scientific facts, or substantial and reliable medical or scientific opinion.  Such labeling caused consumers to request, doctors to prescribe, and payors to pay for long-term opioid treatment using opioids manufactured and/or distributed by Defendants that they would not have otherwise paid for were it not for Defendants' misbranding.

116.

As a result of Defendants' conduct, Madisonville has incurred damages and seeks recovery.

COUNT NO. VII:  VIOLATION OF LOUISIANA PRODUCTS LIABILITY ACT

117.

Madisonville incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges as follows.

32

118.

Due to their failure to provide adequate warnings about their opioids, Pharmaceutical Defendants are in violation of the Louisiana Products Liability Act, La. R.S. §§ 9:2800:51, *et seq.*, because their opioids are unreasonably dangerous, and the damages suffered resulted from a reasonably anticipated use of said opioids.

119.

Pharmaceutical Defendants repeatedly and continuously marketed and advertised their opioids by overestimating the benefits of using them and underestimating the risks, including representations as to the extremely small risk of addiction and touting the abuse-deterring formulation of their opioids, which allegedly made them safer than other pain relievers.

120.

Opioids, when manufactured, are extremely dangerous because they have significant side effects and there is a high risk of addiction; however, Pharmaceutical Defendants not only failed to use reasonable care to provide adequate warnings related to these characteristics of their products, but they repeatedly and aggressively through marketing and advertising pushed the misrepresentations that these opioids were safe and not addictive.

121.

As a result of Pharmaceutical Defendants' conduct, Madisonville has incurred damages and seeks recovery.

### COUNT VIII: UNJUST ENRICHMENT

122.

Madisonville incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges as follows.

123.

Louisiana Civil Code Article 2298 provides, "A person who has been enriched without cause at the expense of another person is bound to compensate that person."

124.

As an expected and intended result of their conscious wrongdoing as set forth herein, Defendants have unjustly profited and benefited from opioid purchases made by persons located in Madisonville.  Defendants' retention of said profits and benefits violates the fundamental principles of justice, equity, and good conscience.

125.

By virtue of the acts alleged herein, Defendants knowingly, willfully, and intentionally marketed, promoted and/or distributed opioid medications in a false and deceptive manner, and knowingly, willfully and intentionally, and without justification, withheld information from persons located in Madisonville regarding the risks associated with long term opioid therapy.

126.

By illegally and deceptively promoting opioids to treat chronic pain, directly, and/or through their control of third parties, and/or by acting in concert with third parties, Defendants have unjustly enriched themselves at Madisonville's expense.  Because of their deceptive promotion of opioids, and other deceptive and fraudulent conduct, Defendants obtained enrichment, to the detriment of Madisonville, that they would not otherwise have obtained; to wit, as set forth herein, as a result of the opioid epidemic, Madisonville has incurred damages and seeks recovery.

127.

Madisonville demands judgment against each Defendant for restitution and disgorgement of any profits which have been obtained at the expense of Madisonville.

### COUNT IX: RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ("RICO")

128.

Madisonville incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges as follows.

129.

At all relevant times, Defendants were "persons" under 18 U.S.C. § 1961(3) because they are entities capable of holding, and do hold, "a legal or beneficial interest in property."

130.

Section 1962 (a) of RICO makes it unlawful "for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. 1962 (a); *St. Paul Mercury v. Williamson*, 224 F. 3d 425, 441 (5th Cir. 2000).

131.

Section 1962 (b) of RICO makes it unlawful "for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

132.

Section 1962 (c) of RICO makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly," in the conduct of such enterprise's affairs

35

through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c); *St. Paul Mercury v. Williamson*, 224 F. 3d 425, 445 (5th Cir. 2000).

133.

The term "enterprise" is defined as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4); *U.S. v. Turkette*, 452 U.S. 576, 580 (1981); *Boyle v. U.S.*, 556 U.S. 938, 944 (2009); *Crow v. Henry*, 43 F.3d 198, 204-205 (5th Cir. 1995). The definition of "enterprise" in Section 1961(4) includes legitimate and illegitimate enterprises within its scope. Specifically, the section "describes two separate categories of associations that come within the purview of an 'enterprise' -- the first encompassing organizations such as corporations, partnerships, and other 'legal entities,' and the second covering 'any union or group of individuals associated in fact although not a legal entity.'" *Id*.; *Turkette*, 452 U.S. at 577. The second category is not a more generalized description of the first. *Id*.

134.

The Controlled Substances Act, 21 U.S.C. § 821, *et seq*. (the "CSA"), establishes a "closed" system for "the manufacturing, distributing and dispensing of controlled substances."[19] The linchpin of this system is the registration with the U.S. Drug Enforcement Administration of all persons who manufacture or distribute controlled substances.

135.

Central to the closed system created by the CSA was the directive that the DEA determine quotas of each basic class of Schedule I and II controlled substances each year. The quota system was intended to reduce or eliminate diversion from "legitimate channels of trade"

---

[19] *Pharmacy Practice and the Law*, Richard R. Abood, p. 184.

by controlling the "quantities of the basic ingredients needed for the manufacture of [controlled substances], and the requirement of order forms for all transfers of these drugs."[20]

136.

DEA's quota system for the basic classes of controlled substances consists of three types of quota summarized below: Aggregate Production Quota ("APQ"), Individual Manufacturing Quota, and Procurement Quota.

   A. Aggregate Production Quota:  The Administrator determines the total amount of each basic class of Schedule I and II controlled substance necessary to be manufactured in a calendar year to provide for the estimated medical, scientific, research, and industrial need of the United States, for lawful export requirements, and for the establishment and maintenance of reserve stocks.

   B. Individual Manufacturing Quota:  Amount of a basic class allocated to registered bulk manufacturers in order to manufacture the substance by producing, preparing, propagating, compounding, or processing it from another substance.

   C. Procurement Quota:  Issued to registered manufacturers who desire to obtain any Schedule I and/or II basic class of controlled substances in order to further manufacture that substance by packaging, repackaging, labeling, relabeling, or producing dosage forms or other substances.[21]

137.

The DEA establishes the APQ for approximately 200 Schedule I and II controlled substances annually.  Once issued, a quota may be increased or decreased, as appropriate.  Any

---

[20]  1970 U.S.C.C.A.N. 4566 at 5490; *see also* Testimony of Joseph T. Rannazzisi before the Caucus on International Narcotics Control, United States Senate, May 5, 2015 (available at https://www.drugcaucus.senate.gov/sites/default/files/Rannazzisi%20Testimony_0.pdf).
[21]  *Id.*

registrant who holds an individual manufacturing quota for a basic class of a Schedule I or II controlled substance may, at any time, request an increase in that quota in order to meet estimated net disposal, inventory, and other requirements during the remainder of the year.  In addition, the Administrator may, at any time, reduce an individual manufacturing quota for a basic class of controlled substance in order to prevent the aggregate of the individual manufacturing quotas from exceeding the APQ for that basic class.[22]

138.

The DEA considers the following factors in its determination of quotas:

A.  Information provided by the Department of Health and Human Services;

B.  Total net disposal of the basic class by all manufacturers;

C.  Trends in the national rate of net disposal of the basic class;

D.  An applicant's production cycle and current inventory position;

E.  Total actual or estimated inventories of the class and of all substances manufactured from the class and trends in inventory accumulation; and

F.  Other factors such as: changes in the currently accepted medical use of substances manufactured for a basic class; the economic and physical availability of raw materials; yield and sustainability issues; potential disruptions to production; and unforeseen emergencies.[23]

139.

For more than a decade, Defendants aggressively sought to sell their dangerous products, enhance revenues and profits, and increase their share of the prescription painkiller market, by unlawfully and surreptitiously increasing the volume of sales of opioid medications.  However,

---

[22] *Id.*
[23] *Id.*; *see also* 21 C.F.R. 1303.11.

Defendants are not permitted to engage in a limitless expansion of their market through the unlawful sales of regulated painkillers.  As "registrants," Defendants operated and continue to operate within the "closed-system" created under the CSA.  The CSA restricts Defendants' ability to manufacture or distribute Schedule II substances like opioids by requiring them to:  (1) register to manufacture or distribute opioids; (2) to maintain complete and accurate inventories and records of transactions involving controlled substances; (3) maintain effective controls against diversion of the controlled substances that they manufacturer or distribute; (4) design and operate a system to identify suspicious orders of controlled substances, halt such unlawful sales, and report them to the DEA; and (5) make sales within a limited quota set by the DEA for the overall production of Schedule II substances like opioids.

140.

It is unlawful for a registrant to manufacture a controlled substance in Schedule II, such as prescription opioids, that is (1) not expressly authorized by its registration and by a quota assigned to it by DEA, or (2) in excess of a quota assigned to it by the DEA.  21 U.S.C. 842 (b)(1) and (b)(2).

141.

Upon information and belief, Defendants, finding it impossible to legally achieve the level of opioid sales which they desired, systematically and fraudulently violated their statutory and legal duty to maintain effective controls against diversion of their drugs, and/or to design and operate a system to identify suspicious orders of their drugs, and/or to halt unlawful sales of suspicious orders, and/or to notify the DEA of suspicious orders.  As discussed in detail herein, Defendants, as members of the RICO Enterprise (sometimes hereinafter "RICO Enterprise" or

39

"Enterprise") repeatedly engaged in unlawful sales of opioids which, in turn, artificially and illegally increased the annual production quotas for opioids established by the DEA.  In doing so, Defendants worked together to cause hundreds of millions of pills to enter the illicit market, which in turn, allowed them to generate huge profits and which created the opioid epidemic which has damaged Madisonville.

142.

The conduct of Defendants, and their continuing conduct, has occurred through legitimate and illegitimate means.  The Pharmaceutical Defendants and the Distributor Defendants formed an association-in-fact enterprise and, within and among them, individual enterprises which, in turn, joined their larger association-in-fact enterprise.  Defendants were associated with, conducted and participated in, and engaged in decision-making in the RICO Enterprise.  Defendants further derived substantial income from a pattern of racketeering activity and invested all or a part of that income to operate the Enterprise, whose purpose was to engage in the unlawful sales of opioids and deceive the public and federal and state regulators into believing that opioids were safe and that Defendants were fulfilling their statutory obligations. As a direct result of Defendants' scheme(s), course of conduct, and pattern of racketeering activity, they were able to derive substantial revenue and profits from the American public, including in Madisonville's community, while entities like Madisonville experienced injury caused by the reasonably foreseeable consequences of the prescription opioid addiction epidemic.  As explained in detail below, Defendants' misconduct violated Sections 1962 (a), 1962 (b), and 1962 (c) and 1962 (d).

143.

Alternatively, Defendants were members of a legal entity enterprise within the meaning of 18 U.S.C. § 1961 (4), through which Defendants conducted their pattern of racketeering

activity in this jurisdiction and throughout the United States; to wit, the Healthcare Distribution Alliance (the "HDA").[24]  The HDA is a distinct legal entity that satisfies the definition of a RICO enterprise.  The HDA is a non-profit corporation formed under the laws of the District of Columbia.  As a non-profit corporation, HDA qualifies as an "enterprise" within the definition set out in 18 U.S.C. § 1961(4) because it is a corporation and a legal entity.

144.

Upon information and belief, each of the Defendants is a member, participant, and/or sponsor of the HAD, and utilized the HDA to conduct the RICO Enterprise and to engage in the pattern of racketeering activity that gives rise to this Count.

145.

Each of the Defendants is a legal entity separate and distinct from the HDA.  And, the HDA serves the interests of distributors and manufacturers beyond the Defendants.  Therefore, the HDA exists separately from the RICO Enterprise, and each of the Defendants exists separately from the HDA.  Therefore, the HDA may serve as a RICO enterprise.

146.

The legal and association-in-fact enterprises alleged in the previous and subsequent paragraphs were each used by Defendants to conduct the RICO Enterprise by engaging in a pattern of racketeering activity.  Therefore, the legal and association-in-fact enterprises alleged in the previous and subsequent paragraphs are pled in the alternative and are collectively referred to as the "RICO Enterprise."

---

[24] *See* HDMA is now the Healthcare Distribution Alliance, Pharmaceutical Commerce, (June 13, 2016, updated July 6, 2016), http://pharmaceuticalcommerce.com/business-and-finance/hdma-now-healthcare-distribution-alliance/.

147.

At all relevant times, the RICO Enterprise:  (a) had an existence separate and distinct

from each Defendant; (b) was separate and distinct from the pattern of racketeering in which the

Defendants engaged; (c) was an ongoing and continuing organization consisting of legal entities

and/or an association-in-fact, including each of the Defendants; (d) characterized by

interpersonal relationships among the Defendants; (e) had sufficient longevity for the enterprise

to pursue its purpose; and (f) functioned as a continuing unit.  *Turkette*, 452 U.S. at 580; *Boyle*,

556 U.S. at 944 (2009).  Each member of the RICO Enterprise participated in the conduct of the

enterprise, including patterns of racketeering activity, and shared in the skyrocketing growth of

profits obtained as a result of Defendants' scheme.

148.

The RICO Enterprise functioned by selling prescription opioids. While there are some

legitimate uses and/or needs for prescription opioids, Defendants, through their illegal enterprise,

engaged in a pattern of racketeering activity, that involved a fraudulent scheme to increase

revenue by violating State and Federal laws requiring the maintenance of effective controls

against diversion of prescription opioids, and the identification, investigation, and reporting of

suspicious orders of prescription opioids destined for the illicit drug market.  The goal of

Defendants' scheme was to increase profits from opioid sales.  But, Defendants' profits were

limited by the production quotas set by the DEA, so Defendants refused to identify, investigate,

and/or report suspicious orders of their prescription opioids being diverted into the illicit drug

market.  The end result of this strategy was to increase and maintain artificially high production

quotas of opioids so that there was a larger pool of opioids for Defendants to manufacture and

distribute for public consumption.

149.

Defendants operated as an association-in-fact; alternatively, a legal entity enterprise, to improperly and illegally increase sales and revenues in order to unlawfully increase quotas set by the DEA and, in turn, to collectively profit from manufacturing and distribution of greater and greater pools of opioids each year.  Each member of the RICO Enterprise participated in the conduct of the enterprise including patterns of racketeering activity.  Each shared profits generated by the scheme.

150.

The RICO Enterprise engaged in, and its activities affected, interstate and foreign commerce because the enterprise involved commercial activities across states lines, such as manufacture, sale, distribution, and shipment of prescription opioids throughout Madisonville and this jurisdiction, and the corresponding payment and/or receipt of money from the sale of the same.

151.

Within the RICO Enterprise, there were interpersonal relationships and common communication by which Defendants shared information on a regular basis.  These interpersonal relationships also formed the organization of the RICO Enterprise.  The RICO Enterprise used their interpersonal relationships and communication network for the purpose of conducting the Enterprise through a pattern of racketeering activity.

152.

Each Defendant communicated with the other Defendants and with others in the chain of distribution on a regular basis by participating in joint lobbying efforts, trade industry organizations and contractual relations, sharing of information, observation of activities and behaviors at the market place, and by other means.  For example, but not exclusively, the

Defendants worked together through advocacy groups to spend multimillions of dollars in lobbying across the United States.  These funds were used to enable and operate the RICO Enterprise.  Defendants and their advocacy groups have engaged in extensive lobbying efforts to either defeat legislation restricting opioid prescribing or promote laws encouraging opioid treatment for pain.[25]  Additionally, and upon information and belief, Defendants, through their advocacy groups and/or through the HDA, engaged in lobbying efforts to weaken the DEA's enforcement authority.[26]  Further, upon information and belief, Defendants were all members of the Pain Care Forum ("PCF").  According to an article published by the Center for Public Integrity and The Associated Press,[27] the PCF has been lobbying on behalf of Defendants for more than a decade; and, from 2006 through 2015, participants in the PCF spent more than $740 million lobbying "in the nation's capital and in all 50 state houses on an array of issues, including opioid-related measures…"[28]  Madisonville, based on this information, is of the belief that Defendants worked together as an ongoing and continuous organization throughout the existence of the Enterprise.

---

[25]  *See* "Fueling an Epidemic Report Two: Exposing the Financial Ties Between Opioid Manufacturers and Third Party Advocacy Groups" https://www.hsgac.senate.gov/.../hsgac-minority-staff-report-fueling-an-epidemic.

[26]  Lenny Bernstein & Scott Higham, *Investigation: The DEA Slowed Enforcement While the Opioid Epidemic Grew Out of Control*, Wash. Post, Oct. 22, 2016, https://www.washingtonpost.com/investigations/the-dea-slowed-enforcement-while-the-opioid-epidemic-grew-out-of-control/2016/10/22/aea2bf8e-7f71-11e6-8d13-d7c704ef9fd9_story.html; Lenny Bernstein & Scott Higham, *Investigation: U.S. Senator Calls for Investigation of DEA Enforcement Slowdown Amid Opioid Crisis*, Wash. Post, Mar. 6, 2017, https://www.washingtonpost.com/investigations/us-senator-calls-for-investigation-of-dea-enforcement-slowdown/2017/03/06/5846ee60-028b-11e7-b1e9-a05d3c21f7cf_story.html; Eric Eyre, *DEA Agent: "We Had no Leadership" in WV Amid Flood of Pain Pills*, Charleston Gazette-Mail, Feb. 18, 2017, https://www.wvgazettemail.com/news/health/dea-agent-we-had-no-leadership-in-wv-amid-flood/article_928e9bcd-e28e-58b1-8e3f-f08288f539fd.html.

[27]  Matthew Perrone, *Pro-Painkiller echo chamber shaped policy amid drug epidemic*, The Center for Public Integrity (September 19, 2017, 12:01 a.m.), https://www.publicintegrity.org/2016/09/19/20201/pro-painkiller-echochamber-shaped-policy-amid-drug-epidemic; "Politics of Pain: A decade of opioid lobbying", Associated Press, http://data.ap.org/projects/2016/cpi_ap_opioids/indexcpiap.html.

[28]  *Id. See* also "Politics of pain: Drugmakers fought state opioid limits amid crisis", https://www.publicintegrity.org/2016/09/18/20200/politics-pain-drugmakers-fought-state-opioid-limitsamid-crisis.

153.

Defendants participated in the operation and management of the RICO Enterprise by directing its affairs, as described herein.  Defendants exerted substantial control over the RICO Enterprise by their membership in the Pain Care Forum, the HDA, and through their contractual relationships.

154.

During the time period alleged in this Complaint, Defendants exerted control over, conducted and participated in the RICO Enterprise by fraudulently failing to comply with their federal and state obligations to identify, investigate and report suspicious orders of opioids, and to halt such unlawful sales, all for the purpose of increasing production quotas and generating unlawful profits.

155.

As set forth herein, Defendants disseminated false and misleading statements to the public regarding the safety of opioid use.  They also disseminated false and misleading statements assuring their compliance with obligations to protect the public against theft, suspicious orders, diversion, over-prescriptions, mis-prescriptions and false information about opioid medications.

156.

As set forth herein, Defendants paid nearly $800 million dollars to influence local, state, and federal governments through joint lobbying efforts as part of the PCF.  Defendants were all members of the PCF either directly or indirectly through the HDA.  The lobbying efforts of the PCF and its members included efforts to pass legislation making it more difficult for the DEA to suspend and/or revoke the registrations of drug manufacturers and distributors for failure to report suspicious orders of opioids.

157.

As set forth herein, Defendants failed to comply with their legal duties under the CSA, including refusal and/or failure to identify, investigate or report suspicious activities of the marketplace and failure to identify and report drug diversion rings about which they had actual knowledge.  They worked together to ensure that opioid production quotas continued to increase, allowing them to generate more and more profits from their illegal Enterprise.  For example, but not exclusively, the Pharmaceutical Defendants lobbied the DEA to increase Aggregate Production Quotas, year after year, by submitting "net disposal information" that the Pharmaceutical Defendants knew included sales that were suspicious and involved the diversion of opioids that had not been properly investigated or reported by Defendants.  It is averred that since the DEA was unaware that false and inaccurate "net disposal information" was being submitted, the DEA unwittingly increased the production quotas for prescription opioids.

158.

Upon information and belief, Defendants engaged in an industry-wide practice of paying rebates and chargebacks to incentivize unlawful opioid prescription sales.  A chargeback is a payment made by a manufacturer to a distributor after the distributor sells the manufacturer's product at a price below a specified rate.  After a distributor sells a manufacturer's product to a pharmacy, for example, the distributor requests a chargeback from the manufacturer and, in exchange for the payment, the distributor identifies to the manufacturer the product, volume and the pharmacy to which it sold the product.  Moreover, as a result, the Pharmaceutical Defendants knew – just as the Distributor Defendants knew – the volume, frequency, and pattern of opioid orders being placed and filled.  The Pharmaceutical Defendants built receipt of this information into the payment structure for the opioids provided to the Distributor Defendants.  The Pharmaceutical Defendants used the chargeback program to acquire detailed, high-level data

regarding sales of the opioids they manufactured.  The Pharmaceutical Defendants also used this high-level information to direct the Distributor Defendants' sales efforts to regions where prescription opioids were selling in larger volumes.  Thus, like the Distributor Defendants, the Pharmaceutical Defendants had access to and possession of the information necessary to monitor, report, and prevent suspicious orders and to prevent diversion.[29]

159.

Defendants worked together to control the flow of information and influence state and federal governments and political candidates to pass legislation that was pro-opioid.  Defendants did this in pertinent part through their participation in the PCF and HDA.

160.

Defendants exerted substantial control over the RICO Enterprise by their membership in the organizations set forth herein and through their contractual relationships (such as, but not exclusively, rebate or chargeback agreements).

161.

As RICO scheme participants, Defendants engaged in intentional steps to conceal their scheme. As set forth herein, they used unbranded advertisements, third parties, advocacy groups, and other methods to disguise the sources of their fraudulent statements, increase the effectiveness of their misinformation campaign, deceive hospitals, doctors and patients, and sell more and more quantities of opioids.

162.

In pertinent part, the term "racketeering activity" is defined as "(A) any act or threat involving … or dealing in a controlled substance or listed chemical (as defined in section 102 of

---

[29]  Administrative Memorandum of Agreement between the United States Department of Justice, the Drug Enforcement Agency, and Mallinckrodt, plc. and its subsidiary Mallinckrodt, LLC, *Justice.gov*, U.S. Dept. of Justice, July 2017, p. 5. Web. 25 Oct. 2017; https://www.justice.gov/usao-edmi/press-release/file/986026/download.

the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year; … (B) any act which is indictable under any of the following provisions of title 18, United States Code: … Section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), … (D) any offense involving fraud connected with a case under title 11 (except a case under section 157 of this title), fraud in the sale of securities, *or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act)*, punishable under any law of the United States, …"  18 U.S.C. § 1961(1)(A)-(D) (*emphasis* supplied).

163.

Defendants conducted and participated in the conduct of the RICO Enterprise through a pattern of racketeering activity as defined in 18 U.S.C. § 1961 (1)(B), including mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343); and 18 U.S.C. § 1961 (1)(D) by the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substance Act), punishable under any law of the United States.

164.

Defendants carried out, or attempted to carry out, a scheme to defraud federal and state regulators, and the American public by knowingly conducting or participating in the conduct of the RICO Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961 (1) that employed the use of mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

165.

Defendants committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity (i.e. violations of 18 U.S.C. §§ 1341 and 1343) within the past ten years.  The multiple acts of racketeering activity that Defendants committed, or aided and abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."  The racketeering activity was made possible by Defendants' regular use of the facilities, services, distribution channels, and employees of the RICO Enterprise.  Defendants participated in the scheme to defraud by using mail, telephone and the Internet to transmit mailings and wires in interstate or foreign commerce.

166.

Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

    A.  Mail Fraud:  Defendants violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the prescription opioids by means of false pretenses, misrepresentations, promises, and omissions; and

    B.  Wire Fraud:  Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the prescription opioids by means of false pretenses.

167.

Each time a participant in the RICO scheme distributed a false statement by mail or wire, or via the Internet, it committed a separate act of mail or wire fraud contrary to 18 USC §§ 1341 and 1342 respectively.

168.

Each Defendant used thousands of pieces of interstate mail and of interstate wire communications and email to accomplish their scheme through virtually uniform misrepresentations, concealments, false and material omissions, and deceptions concerning opioid products, and regarding their compliance with their mandatory reporting requirements. The pattern was one of racketeering activity intentionally committed and participated in, by each said Defendant, to carry out their unlawful goal of selling prescription opioids without reporting suspicious orders or the diversion of opioids into the illicit market.

169.

Defendants' use of the mail and wires includes, but is not limited to, the transmission, delivery, or shipment of the following by the Manufacturers, Distributors, or third parties that were foreseeably caused to be sent as a result of Defendants' illegal scheme, including but not limited to:

    A.  The prescription opioids themselves;

    B.  Documents and communications that facilitated the manufacture, purchase and unlawful sale of prescription opioids;

    C.  Defendants' DEA registrations;

    D.  Documents and communications that supported and/or facilitated Defendants' DEA registrations;

E.  Documents and communications that supported and/or facilitated the Defendants'
    request for higher aggregate production quotas, individual production quotas, and
    procurement quotas;

F.  Defendants' records and reports that were required to be submitted to the DEA
    pursuant to 21 U.S.C. § 827;

G.  Documents and communications related to the Defendants' mandatory DEA
    reports pursuant to 21 U.S.C. § 823 and 21 C.F.R. § 1301.74;

H.  Documents intended to facilitate the manufacture and distribution of Defendants'
    prescription opioids, including bills of lading, invoices, shipping records, reports
    and correspondence;

I.  Documents for processing and receiving payment for prescription opioids;

J.  Payments from the distributors to the manufacturers;

K.  Rebates and chargebacks from the manufacturers to the distributors;

L.  Payments to Defendants' lobbyists through the Pain Care Forum;

M.  Payments to Defendants' trade organizations, like the HDA, for memberships
    and/or sponsorships;

N.  Deposits of proceeds from Defendants' manufacture and distribution of
    prescription opioids; and

O.  Other documents and things, including electronic communications.

170.

As set forth herein above, each Defendant was a "registrant" as alleged and required to

comply with the CSA.  Each Defendant knowingly and intentionally failed and refused to do so

and conspired with the others to conceal their non-compliance, and accomplish their scheme.

171.

As a result of Defendants' actions, Madisonville has incurred damages, and there is a grave and immediate threat on continuing and ongoing damages due to Defendants' ongoing wrongful conduct, and seeks recovery, including, but not limited to, treble damages and attorneys' fees, costs and expenses.  *See* 18 U.S.C. § 1964(c).

## COUNT X:  LOUISIANA RACKETEERING ACT

172.

Madisonville incorporates by reference all other paragraphs of this Complaint as if fully set forth here, and further alleges as follows.

173.

Madisonville has standing to bring this action as a "person who is injured by reason of any violation of the provisions of R.S. 15:1353."  La. R.S. § 15:1356 (E).

174.

The Louisiana Racketeering Act prohibits "committing, attempting to commit, conspiring to commit, or soliciting, coercing, or intimidating another person to commit any crime that is punishable under . . . the Uniform Controlled Dangerous Substances Law," among other enumerated acts.  La. R.S. § 15:1352 (A).  Opioids are classified as both Schedule I and Schedule II drugs under Louisiana law.  La. R.S. § 40:964.  The Louisiana Uniform Controlled Dangerous Substances Law explicitly provides that "[p]hysical dependence is an expected result of opioid use."  La. R.S. § 40:961(29.1).  Unauthorized manufacture, distribution, or dispensing of opioids constitute predicate acts of racketeering activity under the Louisiana Racketeering Act.  La. R.S.§ 15:1352 (A)(13) (*citing* La. R.S. § 40:967 (A)).

175.

Defendants violated section 15:1353 of the Louisiana Racketeering Act by knowingly, intentionally, and unlawfully aiding and abetting each other to commit violations of the Louisiana Uniform Controlled Dangerous Substances Law.

176.

Defendants also violated section 15:1353 of the Louisiana Racketeering Act by knowingly receiving "proceeds derived, directly or indirectly, from a pattern of racketeering activity to use or invest, whether directly or indirectly, any part of such proceeds, or the proceeds derived from the investment or use thereof, in the acquisition of any title to, or any right, interest, or equity in immovable property or in the establishment or operation of any enterprise." La. R.S. § 15:1353 (A).

177.

Defendants conducted the RICO Enterprise, as defined above, through a pattern of racketeering activity in violation of Section 15:1353 (C) and have conspired to violate Section 15:1353 (C) in violation of Section 15:135 3(D). La. R.S. § 15:1353.

178.

Defendants violated Section 15:1353 (D) by knowingly, intentionally, and unlawfully aiding and abetting each other and the RICO Enterprise and conspired to conduct and participate, directly and indirectly, in the conduct of the RICO Enterprise, through the pattern of racketeering activity described herein. La. R.S. § 15:1353 (D).

179.

Defendants' RICO Enterprise existed as an "enterprise" as defined in Section 15:1352 (B). Defendants' RICO Enterprise existed as an association in fact and included unlawful as well as lawful enterprises. La. R.S. § 15:1352 (B).

180.

As described above and as fully incorporated herein, the violations set forth herein constitute "racketeering activity" within the meaning of sections 15:1352 (C) and 15:1353 with at least two such acts of racketeering activity having occurred within the past five years.

181.

Defendants' violations of law and their pattern of racketeering activity directly and proximately caused Madisonville injury in its business and property because Madisonville incurred damages associated with the opioid epidemic as described herein.

182.

As a result of Defendants' actions, Madisonville has incurred damages, and there is a grave and immediate threat on continuing and ongoing damages due to Defendants' ongoing wrongful conduct, and seeks recovery, including, but not limited to, treble damages and attorneys' fees, costs and expenses. *See* La. R.S. § 15:1356 (E).

### COUNT XI: LANHAM ACT

183.

Madisonville incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges as follows.

184.

Each Defendant, as manufacturer and/or distributor, did, in connection with opioids, their manufacture, testing, distribution and delivery, used in commerce, in connection therewith, words, terms, names, symbols and devices or a combination thereof, as well as false and/or misleading descriptions of fact and/or false and misleading representations of fact. These actions were and are likely to cause confusion or to cause mistake or to deceive as to the approval of their goods or commercial activities by another person. In addition, in commercial advertising or

54

promotion, Defendants misrepresented the nature, characteristics, and/or qualities of the opioids they sold and/or distributed, all in violation of 15 U.S.C. 1125 (a)(1)(B).

185.

The aforementioned violations of the Lanham Act directly and proximately caused Madisonville injury in its business and property because it paid for costs associated with the opioid epidemic, as described herein in allegations expressly incorporated herein by reference; to wit, but for Defendants' violation of the Lanham Act, Madisonville would not have suffered said damages, and seeks recovery of same.

### *DAMAGES*

186.

Madisonville, like so many states, counties/parishes and municipalities around the nation, has been harmed by this ongoing opioid epidemic.

187.

Emergency services such as ambulances and fire departments have been and will continue to be required to respond to overdoses associated with prescription opioids and motor vehicle accidents that result from opioid addicts operating vehicles under the influence.

188.

Madisonville's law enforcement officers have been and will continue to be required to expend time and resources investigating overdose deaths, motor vehicle accidents that result from opioid addicts operating vehicles under the influence, investigations and arrests associated with possession of diverted opioids, property crimes committed by opioid addicts seeking to fund their addictions.  Law enforcement officers have and will continue to expend resources as part of the booking, jailing, prosecution and probation associated with arrests related to the opioid crisis.

189.

This diversion of services results in lost productivity of employees of Madisonville. Further, lost productivity of the citizens of Madisonville who are addicted to or abuse Defendants' opioids, or must deal with the effects of same, results in lower tax revenue for the town.

190.

Additionally, as prescribed opioids are considered a gateway drug for heroin, opioid addicted residents no longer able to get prescriptions are at a high risk of seeking out other illegal drugs to fill the void, causing an increase in the abuse and trade in said illicit drugs.  Upon information and belief, the affect this has had and will have into the future on Madisonville's law enforcement and emergency services is significant.

191.

Madisonville, and its tax payers, who fund the law enforcement, emergency services and other government services, should not be bearing the costs associated with Defendants actions.

192.

As a result of the damages caused by Defendants' actions, Madisonville seeks the following recovery:

    A. Recoupment of taxpayer money expended on law enforcement and emergency responders required to respond to incidents attributable to the opioid epidemic;

    B. Recoupment of taxpayer money expended to pay for property damage associated with incidents attributable to the opioid epidemic;

    C. Recoupment of taxpayer money expended on the procurement of medications used to reduce the effects of opioid overdoses, and any costs and expenses associated with training on the administration of said medications;

D.  Damages sufficient to cover expenditures into the future for education and training of law enforcement officers, emergency responders, teachers and other government officials to combat and deal with the specific issues that arise related to opioid abuse;

E.  Damages sufficient to cover expenditures into the future for treatment/detox/rehab clinics for opioid abusers and addicts;

F.  Damages sufficient to cover expenditures into the future for medications used to reduce the effects of opioid overdoses;

G.  Damages sufficient to cover expenditures into the future for school and community outreach programs, seeking to educate Madisonville's residents on prevention of and responses to opioid abuse and addiction;

H.  Restitution and disgorgement of profits;

I.  Compensatory Damages for past and future costs to abate the ongoing public nuisance caused by the opioid epidemic;

J.  Reasonable attorneys' fees, costs and expenses;

K.  Treble damages as allowed under Louisiana Revised Statute § 51:1409 (A), the RICO Act, the Louisiana Racketeering Act and/or the Lanham Act;

L.  Any and all other damages and expenditures, past and future, caused by the opioid epidemic; and

M.  Any and all available statutory penalties and relief available.

### *DEMAND FOR JURY TRIAL*

Pursuant to Rule 38 of the Federal Rules of Civil Procedure (or any other applicable federal or local rule), Madisonville demands a trial by jury on all issues related herein.

### *PRAYER FOR RELIEF*

**WHEREFORE**, Plaintiff, The Town of Madisonville, demands a judgment against

Defendants, Purdue Pharma, L.P., Purdue Pharma, Inc., The Purdue Frederick Company,

Allergan USA, Inc., Allergan, PLC, Endo Pharmaceuticals, Inc., Endo Health Solutions, Inc.,

Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, LTD., Cephalon, Inc., Janssen

Pharmaceuticals, Inc., Johnson & Johnson, Mallinckrodt, PLC, Mallinckrodt, LLC, Insys

Therapeutics, Inc., McKesson Corporation, Cardinal Health, Inc., and AmerisourceBergen Drug

Corporation, jointly, severally and *in solido* for all damages hereinabove alleged, with legal

interest from the date of demand (i.e., pre-judgment and post judgment interest), together with all

costs and disbursements of this action, for all other compensatory damages allowed by law, any

and all statutory relief available, treble damages, reasonable attorneys' fees, costs and expenses,

and for all appropriate general, legal, injunctive and equitable relief available to it under the laws

of the United States and the State of Louisiana, and for a civil trial by jury.


Respectfully submitted:


_____
**C. ARLEN BRAUD, II, #20719**
**MICHELLE O. GALLAGHER, #23886**
**STEVEN D. JACKSON, #35841**
Braud & Gallagher, L.L.C.
111 N. Causeway Blvd., Ste. 201
Mandeville, Louisiana 70448
Telephone:     (985) 778-0771
Facsimile:      (985) 249-2662
arlenb@braudandgallagher.com
michelleg@braudandgallagher.com
stevenj@braudandgallagher.com
***Counsel for The Town of Madisonville***

**<u>SERVICE OF PROCESS:</u>**

By waiver, pursuant to Rule 4(d) of the Federal
Rules of Civil Procedure